William A. Broscious, VSB #27436
Kimberly A. Taylor, VSB #29823
KEPLEY BROSCIOUS & BIGGS, PLC
2211 Pump Road
Richmond, VA 23233
(757) 636-9826
(804) 741-6175 (Facsimile)

*Counsel for the Trustee*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## Richmond Division

In re:

| | |
|---|---|
| **DIGITAL INK, INC.,** and **CHRISTOPHER DAVID McGINNIS,** Debtors. | Case No. 18-30056 KLP Chapter 7 (Jointly Administered) |
| **HARRY SHAIA, JR., TRUSTEE** Plaintiff, v. **BMST, INC., DIGITAL INK, INC., CHRISTOPHER DAVID McGINNIS, MARK BELTRAMI and GABREILLE RAGLAND, a/k/a GABRIELLE CARDINALE,** Defendants. | APN: |

### COMPLAINT TO AVOID TRANSFERS, IMPRESS SUCCESSOR LIABILITY, AND OBTAIN AN ORDER OF SUBSTANTIVE CONSOLIDATION

Harry Shaia, Jr., in his capacity as Chapter 7 Trustee for the bankruptcy estates of Christopher David McGinnis ("McGinnis") and Digital Ink, Inc. ("DII"), by counsel, states as follows for his complaint against BMST, Inc., McGinnis, DII, Mark Beltrami and Gabrielle Cardinale Ragland:

## JURISDICTION AND VENUE

1. On May 31, 2017, McGinnis filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code.

2. Harry Shaia, Jr. was appointed as interim Chapter 7 Trustee of McGinnis' case on August 29, 2017, following the resignation of two prior interim Trustees, and continues to serve as Trustee.

3. McGinnis owned 100% of the capital stock of DII.

4. On January 5, 2018, the Trustee caused DII to file for Chapter 7 bankruptcy relief. Mr. Shaia has been appointed as interim Chapter 7 Trustee for DII's case and continues to serve as Trustee in that case as well.

5. The Court ordered these cases to be jointly administered as specified in its May 22, 2018 Order.

6. The Court has jurisdiction over this adversary proceeding under 28 U.S.C. §§ 157(a) and 1334. This proceeding is a core proceeding within the meaning of 28 U.S.C. §§ 157(b)(2).

7. The predicates for the requested relief are 11 U.S.C. §§ 105(a), 544, 548 and 550, 28 U.S.C. §§ 2201 and 2202 and applicable state law.

8. Venue is proper in this Court under 28 U.S.C. §§ 1408 and 1409.

## PARTIES

9. Harry Shaia, Jr. is the duly appointed Chapter 7 Trustee for the debtors' bankruptcy estates.

10. McGinnis is one of the debtors in this jointly administered bankruptcy proceeding. He was the sole owner, officer and director of DII and now works at BMST.

11. DII is one of the debtors in this jointly administered bankruptcy proceeding and is a Virginia corporation whose corporate status was automatically terminated by the State Corporation Commission in April of 2016. It was a printing business, specialized in political printing and operated under the name "Think Print."

12. BMST, Inc. is a Virginia corporation that was formed to acquire the assets and business of DII. It is a printing business, specializing in political printing and operating under the name "Think Print."

13. Mark Beltrami is a Virginia resident and an owner, officer and director of BMST.

14. Gabrielle Cardinale Ragland ("Ragland") is a Virginia resident who has lived with McGinnis since 2014. She worked at DII and now works at BMST. For the majority of the relevant period, Ms. Ragland used her married name Ragland. She has since reverted to using her maiden name.

## NATURE OF THE CASE

15. This case involves a debtor, desperate to avoid support obligations from a protracted and contentious divorce, who concocted a scheme with his gym buddy to move his business out of his wife's and other creditors' reach until after the dust clears from the debtor's divorce and bankruptcy proceedings. The company they formed for this purpose should now bear all

the liabilities the debtor sought to avoid, both his individual debt and the debt of the sham company through which he had operated.

## FACTUAL ALLEGATIONS

### MCGINNIS AND HIS SHAM COMPANY – DIGITAL INK, INC.

16. McGinnis formed DII in December 2001 and elected C corporation status for federal tax purposes.

17. On his 2014 and 2015 federal income tax returns, McGinnis reported his income from DII under Schedule C, which is used to report business income and expenses from a sole proprietorship. He reported neither wages (from a C corporation) nor Schedule E income (from a pass-through entity).

18. From the beginning, McGinnis operated DII as a sole proprietorship, treating company funds as if they were his personal funds.

19. He used DII funds to pay for the construction and furnishing of his house, as well as for groceries, clothing, jewelry, hotel stays and personal entertainments and pleasures.

20. From at least the middle of 2012, McGinnis withdrew large amounts of cash from DII.

21. He used company funds to pay for bail and a criminal attorney for one of his girlfriends.

22. He regularly cashed company checks, some for thousands of dollars, at the Club Rouge strip club.

23. McGinnis's personal bankruptcy schedules identify a substantial number of creditors to whom he owed "business debt." He does not list DII as a co-debtor on any of the debt.

24. When the Trustee caused DII to file for Chapter 7 bankruptcy relief he used Mr. McGinnis' personal schedules to identify DII's creditors because DII did not produce business records.

25. McGinnis verified the accuracy of DII's schedules under oath at a 341 meeting.

THE LIABILITIES MCGINNIS SOUGHT TO AVOID

26. DII's revenues fluctuated with the political seasons. The company made over a million dollars during presidential election years. The mid-term Congressional election seasons were also very profitable. During off years, however, DII operated on much tighter margins.

27. At the end of 2012, DII's financial condition began to deteriorate into insolvency.

28. With the close of the political season, DII owed its paper supplier a significant sum of money. Rather than use the revenues from the presidential election season to pay trade debt incurred during that season, McGinnis took $400,000 out of the company for his own personal use.

29. As a result of McGinnis' large cash withdrawal, DII was unable to pay its debts as they became due during the off season. DII's financial condition never recovered.

30. Around the same time, McGinnis' marriage failed; he and his wife formally separated in June 2013 and filed for divorce. Their hotly contested divorce proceeding lasted five years.

31. In July 2014, the Circuit Court of Chesterfield County found that McGinnis' income prior to commencement of the divorce was approximately $392,000 per year. Based on that income, the Court entered a *Pendente Lite* order requiring him, in addition to providing full medical and dental insurance, to pay (i) over $5,000 a month in child and spousal support, (ii) the mortgages on the marital home, (iii) the lease payments on his wife's Mercedes, (iv) the private school tuition for his children, and (v) the minimum payments on three credit cards that had five-figure balances.

32. McGinnis wanted to reduce drastically the court ordered support and payment obligations because it impinged on his playboy lifestyle. McGinnis was living with Ragland, supporting her and her child. He was making extravagant expenditures at Club Rouge. He also purchased a car, expensive jewelry and clothing for a different girlfriend.

33. To reduce his support obligation and avoid the mounting debts at DII while retaining the anticipated revenue of the upcoming presidential election season, McGinnis concocted a scheme with his friend Beltrami to reduce his evident income and transfer the anticipated profits out of his ex-wife's and creditors' reaches.

BMST's Acquisition of DII's Business

34. McGinnis met Beltrami at the gym they both frequented and they became good friends.

35. On information and belief, McGinnis confided in Beltrami about his marital and financial difficulties. McGinnis also told Beltrami about the cyclical nature of DII's business and the large profits anticipated to be made in the upcoming presidential election season.

36. In September of 2015, Beltrami and McGinnis began to structure a transaction that they believed would accomplish McGinnis' twin goals of reducing his evident income and removing anticipated profits from the reach of his ex-wife and other creditors.

37. On October 30, 2015, Beltrami formed BMST, Inc., a Virginia stock corporation.

38. The initial directors of BMST were **B**eltrami, **M**cGinnis, Tracy **S**alyer and Robert **T**hompson.

39. In January 2016, BMST purchased the assets and business operations of DII in a transaction that has no documentation, not even a bill of sale.

40. McGinnis testified that BMST purchased DII's assets for pennies on the dollar. The purchase price was determined by the amount that Beltrami could negotiate with certain key creditors of DII and McGinnis: the secured creditors, a creditor that had a judgment lien against McGinnis, and a creditor that was pressing criminal charges against McGinnis for passing a bad check.

41. DII's assets were not purchased through an Article 9 sale.

42. The only document even tangentially evidencing the transaction relates to a $1,250,000 loan from EVB to BMST on January 6, 2018. The Disbursement Request and Authorization for the loan reveal that BMST paid $1,241,401.28 to or for the benefit of DII.

43. DII's business transferred seamlessly and imperceptibly to BMST. The business was operated in the same place, under the same trade name, with the same employees and customers and with McGinnis still at the helm.

44. McGinnis and Beltrami structured the transaction in such a way to preserve the business for McGinnis until after his divorce became final and hopefully the dust cleared from his and DII's bankruptcy cases. McGinnis was required to run the company in the interim, and the investors would reap the profits from the 2016 presidential election season. Afterward, McGinnis had the right to reclaim the company.

45. McGinnis and BMST, through Beltrami, entered into a very unusual employment agreement. The five-year agreement provides that McGinnis will pay BMST liquidated damages on a sliding scale from $750,000 to $100,000 if he terminates his employment before the end of the term. The agreement also gives McGinnis the right of first refusal to purchase the company's capital stock at the end of the five-year term.

46. In its first year of operation, BMST's gross revenues were in excess of $9 million and its net revenues exceeded $1.4 million. In the absence of the

transfer of DII's business to BMST, that revenue would have been available to pay DII's and McGinnis' joint creditors.

47. McGinnis and Beltrami also structured the transaction in such a way as to artificially suppress McGinnis' income during the pendency of his divorce. He would have a salary of $150,000 and the company would pay directly to McGinnis the cost of his children's health insurance.

48. To further disguise his real income, BMST treated McGinnis as a 1099 contractor. McGinnis asked Beltrami to do so until his divorce was final, at which time he would become a W-2 employee. BMST issued McGinnis a W-2 for the 2016 tax year in the amount of $18,750. The bulk of McGinnis' income was either reported as 1099 income or paid by BMST directly to third parties on McGinnis' behalf.

49. Beltrami has allowed McGinnis to use BMST funds the way he used DII's funds – as his personal bank account. McGinnis pays his monthly support obligations with a company check. McGinnis also regularly uses the company's checks to pay obligations he owes to third parties and to purchase goods and services for his own personal use.

50. BMST even provides McGinnis with a credit card and a truck and pays for his gas.

### RAGLAND ACCOUNT

51. Around the time of the transaction with BMST, McGinnis stopped maintaining a bank account in his own name in order to prevent creditors from being able to garnish his accounts.

52. On February 2, 2016, Ragland opened a checking account at EVB in her name (the "Account"). McGinnis' name was not on the Account.

53. Ragland has testified that the Account was solely for McGinnis' use – all amounts deposited into and withdrawn from the account were McGinnis' funds.

54. As of the day McGinnis filed for bankruptcy protection, Ragland had helped McGinnis shelter $157,438.03 of his funds through use of the Account.

55. Further aiding McGinnis' efforts to hinder, delay or defraud his creditors, BMST deposited some of McGinnis' compensation directly into the Account.

OTHER TRANSACTIONS

56. McGinnis failed to pay the mortgages on the marital residence, causing the residence to be sold at foreclosure.

57. The house for which McGinnis paid $800,000 in 2005 was sold to one of the principals of BMST for $445,000.

58. McGinnis and Ragland now reside in a property purchased for that purpose by BST Holdings LLC, which is owned by Beltrami and the other principals of BMST.

## CLAIMS FOR RELIEF

### COUNT I
AVOIDANCE OF FRAUDULENT TRANSFERS – AGAINST RAGLAND
11 U.S.C. §§ 544(b) AND 550 AND VA. CODE §55-80

59. As detailed above, McGinnis transferred assets to Ragland including, but not limited to, funds deposited into the Account.

60. With the knowing and intentional assistance of Ragland, McGinnis made those transfers with the actual intent to hinder, delay or defraud his creditors.

61. As a result of the transfers, McGinnis' creditors sustained significant damages amounting to, at minimum, $157,438.03.

62. The transfers are avoidable and recoverable from Ragland pursuant to 11 U.S.C. §§ 544(b) and 550 and Va. Code §55-80.

### COUNT II
AVOIDANCE OF FRAUDULENT TRANSFERS – AGAINST RAGLAND
11 U.S.C. §§ 548(a)(1)(A) AND 550

63. As detailed above, McGinnis transferred assets to Ragland including, but not limited to, funds deposited into the Account.

64. With the knowing and intentional assistance of Ragland, McGinnis made those transfers with the actual intent to hinder, delay or defraud his creditors.

65. As a result of the transfers, McGinnis' creditors sustained significant damages amounting to, at minimum, $157,438.03.

66. The transfers are avoidable and recoverable from Ragland pursuant to 11 U.S.C. §§ 548(a)(1)(A) and 550.

**COUNT III**
AVOIDANCE OF FRAUDULENT TRANSFERS – AGAINST RAGLAND
<u>11 U.S.C. §§ 544(b) AND 550 AND VA. CODE §55-81</u>

67. As detailed above, McGinnis transferred assets to Ragland including, but not limited to, funds deposited into the Account.

68. McGinnis did not receive consideration deemed valuable in law in exchange for the transfers.

69. The transfers were made at a time when McGinnis was insolvent.

70. As a result of the transfers, McGinnis' creditors sustained significant damages amounting to, at minimum, $157,438.03.

71. The transfers are avoidable and recoverable from Ragland pursuant to 11 U.S.C. §§ 544(b) and 550 and Va. Code §55-81.

**COUNT IV**
AVOIDANCE OF FRAUDULENT TRANSFERS – AGAINST RAGLAND
<u>11 U.S.C. §§ 548(a)(1)(B) AND 550</u>

72. As detailed above, McGinnis transferred assets to Ragland including, but not limited to, funds deposited into the Account.

73. McGinnis did not receive reasonably equivalent value in exchange for the transfers.

74. The transfers were made at a time when McGinnis was insolvent.

75. As a result of the transfers, McGinnis' creditors sustained significant damages amounting to, at minimum, $157,438.03.

76. The transfers are avoidable and recoverable from Ragland pursuant to 11 U.S.C. §§ 548(a)(1)(B) and 550.

## COUNT V
AVOIDANCE OF FRAUDULENT TRANSFERS – AGAINST BMST AND BELTRAMI
11 U.S.C. §§ 544(b) AND 550 AND VA. CODE §55-80

77. As detailed above, McGinnis transferred assets belonging to him and/or DII to BMST including, but not limited to, the going concern of DII.

78. With the knowing and intentional assistance of BMST and Beltrami, McGinnis made those transfers with the actual intent to hinder, delay or defraud his and DII's creditors.

79. As a result of the transfers, McGinnis' and DII's creditors sustained significant damages, to be measured by the difference between the going concern value of DII and the price paid for the assets.

80. The transfers are avoidable and recoverable from BMST and Beltrami pursuant to 11 U.S.C. §§ 544(b) and 550 and Va. Code §55-80.

## COUNT VI
AVOIDANCE OF FRAUDULENT TRANSFERS – AGAINST BMST
11 U.S.C. §§ 544(b) AND 550 AND VA. CODE §55-80

81. At McGinnis' direction, BMST knowingly and intentionally helped McGinnis hinder, delay and defraud his creditors by transferring McGinnis' earnings into the Account.

82. As a result of the transfers, McGinnis' creditors sustained damages to be measured by the value of the transferred assets.

83. The transfers are avoidable and recoverable from BMST pursuant to 11 U.S.C. §§ 544(b) and 550 and Va. Code §55-80.

## COUNT VII
AVOIDANCE OF FRAUDULENT TRANSFERS – AGAINST BMST AND BELTRAMI
11 U.S.C. §§ 548(a)(1)(A) AND 550

84. As detailed above, McGinnis transferred assets belonging to him and/or DII to BMST including, but not limited to, the going concern of DII.

85. With the knowing and intentional assistance of BMST and Beltrami, McGinnis made those transfers with the actual intent to hinder, delay or defraud his and DII's creditors.

86. As a result of the transfers, McGinnis' and DII's creditors sustained significant damages, to be measured by the difference between the going concern value of DII and the price paid for the assets.

87. The transfers are avoidable and recoverable from BMST and Beltrami pursuant to 11 U.S.C. §§ 548(a)(1)(A) and 550.

## COUNT VIII
AVOIDANCE OF FRAUDULENT TRANSFERS – AGAINST BMST
11 U.S.C. §§ 548(a)(1)(A) AND 550

88. At McGinnis' direction, BMST knowingly and intentionally helped McGinnis hinder, delay and defraud his creditors by transferring McGinnis' earnings into the Account.

89. As a result of the transfers, McGinnis' creditors sustained damages to be measured by the value of the transferred assets.

90. The transfers are avoidable and recoverable from BMST pursuant to 11 U.S.C. §§ 544(b) and 550 and Va. Code §55-80.

## COUNT IX
AVOIDANCE OF FRAUDULENT TRANSFERS – AGAINST BMST AND BELTRAMI
11 U.S.C. §§ 548(a)(1)(B) AND 550

91. As detailed above, McGinnis transferred assets belonging to him and/or DII to BMST including, but not limited to, the going concern of DII.

92. Neither McGinnis nor DII received reasonably equivalent value in exchange for the transfers.

93. The transfers either were made at a time when McGinnis and DII were insolvent or caused their insolvency.

94. As a result of the transfers, McGinnis' and DII's creditors sustained significant damages, to be measured by the difference between the going concern value of DII and the price paid for the assets.

95. The transfers are avoidable and recoverable from BMST and Beltrami pursuant to 11 U.S.C. §§ § 548(a)(1)(B) and 550.

## COUNT X
DECLARATORY JUDGMENT AND SUBSTANTIVE CONSOLIDATION OF BANKRUPTCY CASES
AGAINST MCGINNIS AND DII
28 U.S.C. § 2201 AND 11 U.S.C. § 105(A)

96. As detailed above, McGinnis operated DII as his alter ego, even reporting his income from DII as if the company were a sole proprietorship rather than a C corporation.

97. As such, the corporate existence of DII should be ignored.

98. The Court should declare that DII's assets were also McGinnis' assets at the time of the transaction between BMST and DII.

99. DII's liabilities should be declared to be McGinnis' liabilities, not only because McGinnis treated DII as his alter ego, but also because the

15

creditors and liabilities on DII's schedules were taken from McGinnis' individual bankruptcy schedules.

100. As noted above, the Trustee caused DII to file for Chapter 7 bankruptcy relief. Because McGinnis was unable to produce any books or records of DII, the Trustee scheduled DII's creditors and liabilities using the creditors and liabilities that McGinnis claimed as business debts in his schedules. At his 341 meeting, McGinnis testified that the DII schedules as prepared by the Trustee were accurate.

101. McGinnis' and DII's affairs are so entangled that the cost of separating their accounts would be prohibitive as compared with the potential benefit.

102. This Court should substantively consolidate the two bankruptcy cases.

## COUNT XI
### DECLARATORY JUDGMENT – AGAINST BMST
### 28 U.S.C. §§ 2201 AND 2202

103. The actual intent underlying the transfer of DII's going concern to BMST was to hinder, delay or defraud DII's and McGinnis' creditors.

104. McGinnis transferred the assets to a company set up by his close friend.

105. BMST purchased DII's assets for pennies on the dollar.

106. Beltrami and McGinnis structured the transaction in an unusual manner designed to allow McGinnis to reclaim his business after the dust settled from his divorce and bankruptcy proceedings.

16

107. McGinnis continues to run the business and has the right to reclaim ownership.

108. BMST allows McGinnis to use company funds to pay for personal goods and services.

109. The transfer left DII with no assets and insolvent.

110. Because the sale of DII's assets and going concern to BMST was fraudulent in fact, this Court should declare that BMST, as the successor, is liable for DII's debts.

111. In furtherance of that declaration, this Court should enter judgment against BMST in the amount of DII's allowed claims.

## RELIEF REQUESTED

WHEREFORE, Harry Shaia, Jr., Trustee, respectfully requests that this Court, in addition to granting such further relief as this Court deems appropriate, enter:

(i) On Counts I through IV, judgment against Gabrielle Cardinale Ragland in the amount of $157,438.03, or such further value of the transfers as will be proven at trial;

(ii) On Counts V, VII and IX, judgment against BMST, Inc. and Mark Beltrami in the amount of the difference between the going concern value of DII and the price paid for DII's assets, as will be proven at trial;

(iii) On Counts VI and VIII, judgment against BMST, Inc. in the amount of the value of the transfers as will be proven at trial;

(iv) On Count X, an order declaring that DII's assets and liabilities are also assets and liabilities of McGinnis and substantively consolidating the two bankruptcy cases; and

(v) On Count XI, as an alternative to the relief requested in subparagraph (ii), an order declaring that BMST has successor

liability for the debts owed by DII and judgment against BMST in the amount of the allowed claims of DII.

                                          **HARRY SHAIA, JR., TRUSTEE**

By    */s/ Kimberly A. Taylor*
      _____
      Counsel

Kimberly Ann Taylor, VSB #29823
William A. Broscious, VSB #27436
*Counsel for the Trustee*
Kepley Broscious & Biggs, PLC
2211 Pump Road
Richmond, VA 23233
Phone: (757) 636-9826
Fax: (804) 741-6175
ktaylor@kbbplc.com

18